Thank you, Your Honor. Good morning, and may it please the court. My name is Luke Wolford, and it's a privilege to appear before you today in this important matter on behalf of the Petitioner Public Watchdogs. I'd like to reserve five minutes of my time for rebuttal, and I'll do my best to manage my time accordingly. This case stems from the United States inexcusable failure to find a permanent disposal solution for the country's ever-growing stockpile of spent nuclear fuel. Although spent nuclear fuel remains hazardous for hundreds of years, there is no permanent repository for spent nuclear fuel in the United States, nor is there any viable plan to create one in the foreseeable future. As a result, more than 90,000 metric tons of spent nuclear fuel is effectively stranded at nuclear power plants across the country, including the San Onofre Nuclear Generating Station, which I'll refer to as SONGS. Now, rather than plan for the reality that this hazardous waste will likely be stored at these facilities indefinitely, the NRC has simply kicked the can down the road in hopes that a permanent repository will become available. Indeed, the NRC has adopted a reckless policy of approving nuclear power plant decommissioning that are based on the fiction that all spent nuclear fuel will be removed from these nuclear power plants and transferred to a non-existent permanent repository by a date certain in the relatively near future. I thought that there was a generic rulemaking which did expressly take account of the possibility of a very long-term transfer or even an indefinite or never transfer with regard, generally, not with including SONGS but not explicitly on SONGS, and that that was reviewed in the D.C. Circuit and determined to be adequate. Yes, Your Honor, that's correct. The NRC did promulgate the continued storage rule, and they did an analysis via the continued storage generic environmental impact statement, and the result of that really was the NRC concluding that it would be technically feasible to store spent nuclear fuel indefinitely at nuclear power plants. All they determined that it would be technically feasible, but importantly, the NRC also determined that certain conditions would have to be followed in order for spent nuclear fuel to be stored safely at these nuclear power plants. Some of those conditions would include the ability to repackage the spent nuclear fuel when the canisters need to be replaced, which would require either a dry storage indefinitely at a nuclear power plant. You have to plan to replace the interim storage facility at the plant. Now, the problem is not that the NRC has never done this generic analysis. It has. They've done something worse here. They've ignored it by adopting a policy that assumes and falsely assumes that all spent nuclear fuel will be removed from on-site storage facilities and transferred to a non-existent permanent repository in the relatively near future, and that's one of the reasons why we argue, your honor, that the NRC's decision denying the 2.206 petition of public watchdogs is arbitrary and capricious because in assessing decommissioning plans, the NRC is not following its own regulations and policies that are embodied in the continued storage GEIS. What the NRC is doing is using this false assumption that a permanent repository will become available by a date certain in the relatively near future in order to avoid having to conduct any analysis or make any plans for the indefinite storage of spent nuclear fuel at these on-site facilities. Now, respectfully, we would respectfully submit that that policy is an abdication of the NRC's paramount statutory response. Where is that policy? In what document is that policy? That policy is embodied in every decommissioning plan that the NRC approves of. The NRC's own regulations, 10 CFR 50.54 BB, require nuclear power plants that are decommissioning to submit a decommissioning plan that sets forth and explains to the NRC how it will manage spent nuclear fuel on-site until that fuel is taken to a permanent repository. Now, the reality is there is no permanent repository and there's no plan to create one in the foreseeable future. And so, what the NRC has done and what nuclear power plant licensees do is they assume, just arbitrarily assume, that a permanent repository will become available by a date certain. And the NRC, rather than saying, no, no, no, there is no permanent repository, the reality is there is no permanent storage facility. And this stuff will likely be stored on-site for much longer than the artificial date that's in your decommissioning plan. So, you need to explain to us how you're going to plan for and pay for storage beyond that arbitrary date. What the NRC has done is said, no, that's fine. We will just adopt this arbitrary date by which we are, you know, hoping that a permanent repository becomes available and will only require you to plan for storage and management of spent nuclear fuel until that arbitrary date. This is incredibly troubling. This isn't just a trifling matter. You know, this, the date by which these nuclear power plants assume that spent nuclear fuel will be transferred away from their on-site facilities to a permanent repository necessarily impacts every aspect of the decommissioning plan from the selection of the storage location, which at Song's, I would note, is 108 feet from the Pacific Ocean in a heavily populated area in a tsunami inundation zone surrounded by active fault lines and merely inches above the median high tide level. This is about the most precarious location possible. And it's certainly not a location that's suitable for indefinite storage, but by pretending that this spent nuclear fuel will be moved away from this location to a non-existent permanent repository by a date certain in the relatively near future, the NRC is allowing Southern California Edison to bury some of the most, you know, hazardous substance known to humankind, tons of it, in this precarious location without any plan to do anything with it beyond the arbitrary date set forth in the decommissioning plan. This arbitrary date also impacts the decisions that are made regarding the type of storage installation and the type of canisters that are used. The canisters that are in use at Song's are only licensed until the year 2035. And that's 14 years before the arbitrary date in the Song's decommissioning plan. So, you know, by pretending that spent nuclear fuel will only remain on site for a finite and relatively short period of time, the NRC is allowing licensees to use canisters that are not suitable for indefinite storage without requiring them to show any ability to repackage the canisters or replace the canisters if something happens. The generic rulemaking concluded that there was no reason now to have them build the facilities for repackaging because they could be built in a year or two should they prove necessary. I don't think the continued storage GEIS actually says there's no reason to plan for this now. What the continued storage GEIS says, and I should point out, the continued storage GEIS does not specifically authorize the storage of spent nuclear fuel. It's simply a generic analysis of what would be required in order to store spent nuclear fuel safely at a nuclear power plant. And it lays out these necessary conditions for it, including the ability to repackage the spent nuclear fuel and replace the storage facility. Now, the generic or the continued storage GEIS says nothing about, you know, whether at the time of decommissioning, a nuclear power plant licensee needs to plan for this stuff. However, the reality is that at the time of decommissioning, it is likely that spent nuclear fuel will be stored at an on-site facility indefinitely. The NRC has established policies and regulations that set forth the necessary conditions to be able to do that. And so in order to comply with its own regulations and policies, the NRC should be planning and should be required to plan for the indefinite storage of these on-site facilities and not simply plug an arbitrary date at which they, you know, presume that spent nuclear fuel will be removed from these facilities and say, we'll plan our whole decommissioning plan around that date. You know, for instance, at Songs, Your Honor, the spent fuel pools at Songs are the only alternative storage place that infrastructure on the facility that exists that would allow, even potentially allow, the repackaging of spent nuclear fuel. Because there's this presumption that all the spent nuclear fuel will be gone from the dry storage facility by a date certain in the relatively near future, part of the decommissioning plan is to destroy these spent fuel pools in the next few months. And at that point, there will be no infrastructure left at Songs by which Edison, even if it had the technological capability to do so, which it admits that it doesn't, even if Edison did have the capability to repackage a canister full of this hazardous waste, it would require a spent fuel pool or a dry transfer station to do that. But because... Require what? I'm sorry, I didn't hear that. A spent fuel pool or a dry transfer station. And because they assume that this spent nuclear fuel will only be there temporarily, they're planning to destroy the spent fuel pool and there's no plan to construct a dry transfer station. Now, granted, the NRC does argue that, hey, look, it's okay for us to approve these decommissioning plans based on these false assumptions, because we can always address it later. But again, as I pointed out, these decommissioning plans set in motion things that aren't so easily changed down the road. I'm going back to the dry transfer again. I thought the Continued Storage GIS said that designing, constructing a dry transfer system would be a relatively straightforward process in short term. You say it's not in there. You didn't say that? Yes, Your Honor. There's no plan in the Songs... Nothing in the Songs decommissioning... And the Continued Storage GIS says that we're talking about... And it's not going to be a problem to do it. Well, the Continued Storage GIS does estimate that it would take two to three years to construct a dry transfer station. There's nothing in the Continued Storage GIS on that, but there is. Oh, no, Your Honor. I'm sorry if I didn't articulate that correctly. There's nothing in the Songs decommissioning plan that provides for... That's explained in the Continued Storage GIS by saying that it can be done in two or three years. In 100 years, there's no reason to worry about it now. That's basically what they're saying. I think that is what the NRC is saying. And the Continued Storage GIS does estimate that it would take two to three years. But the problem, Your Honor, is because there's... The Songs decommissioning plan and other decommissioning plans are based on the false assumption that all the spent fuel will be moved. There's no plan to pay for the construction of a dry transfer station. We are looking at... There is a bunch of money in escrows, I understand it. And that is reviewed every year. Is that not right? Yes, Your Honor. That's correct. The Songs decommissioning trust does have $4 billion in it. But if you look at the decommissioning cost estimate, you can see that almost all of that money is attributed to decommissioning the site and managing the spent fuel only until 2049. There has never been an analysis done with respect to how much money it would cost to store spent nuclear fuel at Songs indefinitely. The NRC hasn't done that analysis. Instead, it's allowed Edison to embark on this decommissioning to bury this hazardous waste in this very perilous location in canisters that aren't built for indefinite storage. And it's just saying, hey, we'll figure this out later if something comes up. And respectfully, I don't think that the NRC can actually provide that assurance that they will be able to figure out a solution. One thing I haven't been able to understand, just why is something's got to happen to this fuel now? If it's not in these canisters now, it's in this wet storage, which I gather there seems to be general consensus is more dangerous. So what is the interest now in not putting this stuff into the canisters and the concrete that it's stored in? Even if something else has to be figured out later, I don't understand what the argument is for stopping. First of all, I gather they're kind of done doing it. But I guess you could take the canisters out, but why would you want to do that? We're not asking this court to order Edison to remove the canisters at this point, nor are we saying as a general matter that moving canisters to dry storage on-site facilities is necessarily a bad thing. And frankly, that's the only option. And as we've stated in our briefs... So what are you asking for? Thank you, Your Honor. What we're asking this court to do is set aside the 2.206 petition and remand it to the agency to require the NRC to stop basing the decommissioning decisions and stop basing its analysis with respect to the storage of spent nuclear fuel at They need to base the analysis on the reality. And all we're asking is for the NRC to plan for the reality that this spent nuclear fuel will likely be stored at Songs indefinitely. We're not asking this court to dictate how they plan for that reality. We're not asking this court to solve the permanent disposal problem that's plagued this country for decades. All we're asking this court to do is to require the NRC to make its decommissioning decisions based in reality rather than a fiction. They've adopted a knowingly false presumption and then based their decisions regarding decommissioning plans entirely around this false presumption. And there are... I have a question. Certainly, Your Honor. If the NRC finds a permanent place for it, then you give up this lawsuit here? I mean, maybe they'll find one next week. Is that possible? I can understand why they can't find one, but if they find one, then you give up your case, huh? Well, certainly, Your Honor, if there were a permanent repository available, and there was an established schedule to show when spent nuclear fuel would be removed from and the NRC planned the decommissioning and spent fuel storage around that established schedule, sure. I don't think we would have a gripe at this point. The fuel's already in this perilous location. I don't think it was a smart, wise decision to put it in that location, but at this point, it's already there. And if it's transferred to a permanent repository, then great. But our concern, Your Honor, is... And first of all, I wish that a permanent repository would become available tomorrow or in the next couple of weeks. The NRC's own estimates are that it would take approximately 35 years to even find a permanent repository, to site and construct one, which again, that's six years beyond the date on which they falsely assume that the spent nuclear fuel will be removed from SOMS. So what we're asking the court to do is just require the NRC to make decisions based in reality, not based on a knowingly false assumption and really a faint hope that a permanent repository will become available. I know you're calling it a false assumption. I'm sure NRC will say it's a reasonable assumption. It's decades ahead. It doesn't suggest it's ultimately a policy disagreement. And given this is the APA and we generally can't review enforcement or non-enforcement decisions, is this really an abdication of their duty? Thank you, Judge Lee. We would respectfully submit that it is an abdication. What abdication is, there's no clear test for what constitutes agency abdication for purposes of determining whether an exception applies to the general presumption against judicial review of discretionary agency actions. However, I think what the NRC agrees with in the briefs, and I think as the courts that have considered the question have generally agreed that abdication would be failure to take action to address indisputable proof of a known risk. And we would respectfully submit that that's exactly what the NRC has done here. The NRC knows that there is a significant risk that a permanent repository will never become available. But rather than actually address that risk, rather than actually plan for what are we going to do if a permanent repository doesn't become available, what are these nuclear power plants going to do? And how do we ensure that they're able to store spent nuclear fuel safely on site? The NRC has adopted this false presumption or this fiction that we will just assume that spent nuclear fuel will be transferred to a non-existent permanent repository by a date certain. That's exactly what the continued storage GEIS was about. The continued storage GEIS, I agree, Your Honor, was about generically considering what would be necessary. But then the NRC ignores that when it determines and when it assesses. I mean, you're saying it ignores it, but I mean, apparently what it concluded is we should go ahead, you know, on our assumptions. But even if they're wrong, it doesn't make a difference because they're still safe. That's basically what the continued storage GEIS said, right? Respectfully, Your Honor, no, I don't think this continued storage GEIS says that. The continued storage GEIS says, look, we hope that a permanent repository will become available, you know, in the relatively near future. But it recognizes that there's uncertainty in that. And because the D.C. Circuit had overturned the NRC's waste confidence decision and essentially prevented them from granting any new licenses for nuclear power plants, they had to come up with this generic analysis, this generic environmental analysis. And what they determined in that analysis was, OK, spent nuclear fuel could be stored on site indefinitely, but only under certain conditions. And that's where I say that the NRC ignores the continued storage GEIS. Typically, what conditions are they ignoring? They're ignoring the requirements that a nuclear power plant licensee will have to be able to repackage spent nuclear fuel if it's stored indefinitely. And there is no technology available right now to allow nuclear power plant licensees to do that. And any technology that fuel pool. And so, you know, a necessary condition of long term storage would be the construction of a dry transfer station, the replacement of. Certainly not now, but when you but why I say the NRC is ignoring this is because at the time that a nuclear power plant licensee decommissions, they have to set forth how they're going to source that nuclear fuel there until it's transferred to permanent repository. And one of those things would require how how much money do you have? How are you going to pay to manage this comes down to the money? I think that's a piece of it. I'm sorry. Yes, your honor. I think that is a huge piece of it. That's one of the things that the NRC is failing to do is to ensure that when a nuclear power plant decommissions, it's going to have sufficient funds to pay for the long term and potentially indefinite on-site storage of spent nuclear fuel. Okay, your time is up. Thank you, your honor. May it please the court. My name is Andrew Averbach from the United States Nuclear Regulatory Commission. I appear on behalf of both the NRC and the United States. Respondents would like to cede five minutes of their time to counsel for Southern California Edison. In my time today, I'd like to describe why the abdication standard has not been satisfied, both because the NRC has comprehensively evaluated spent fuel storage on a generic and on a site-specific basis, and why even if the decision at issue here were reviewable, Public Watchdogs' claim would still fail because the agency's actions were not arbitrary and decision not to take enforcement action and to put a stop to licensed activity. But in order for the court to even be able to review the agency's decision on the merits, Public Watchdogs must first establish as a threshold matter that the NRC abdicated its statutory responsibility under the Atomic Energy Act. In other words, the agency... I was a little confused, although it's arises under the provision that an applicant withstanding can move to modify, suspend or something a license. Is that essentially what we have here? It is a petition brought under 10 CFR 2206. By making them... I guess by making... Is the plan, decommissioned plan, part of the license or a condition of the license? The decommissioning plan itself is something that... Let me back up. A licensee is permitted to take decommissioning actions as part and parcel of its license. Upon its declaration that it no longer intends to operate, a licensee must submit a so-called decommissioning plan. There are a variety of different documents that have been identified before the court, but in some, those are what I'll call, just for ease of reference, a decommissioning plan. Those activities described in there are within the scope of the licensed authority of the license. This isn't something that the NRC specifically has to grant a hearing on or anything like that. It simply has to be informed of and has to take a look at the plan and then to make sure everything that's been proposed as part and parcel of the decommissioning plan is consistent with the existing license and consistent with prior environmental analyses that have been performed. What's the notice and comment rulemaking with regard to SOMS in particular, three or four years ago, having to do with a decommissioning plan or something or some change in a license or something? There have been license amendments that have been issued and perhaps the court is was the nub of what was being challenged before the district court. In that particular case, the district court said, well, these are really challenges to the license amendment and those need to be pursued solely under the Hobbs Act. But the plan itself, there wasn't a specific environmental analysis performed at the time that Southern California Edison here submitted its decommissioning plan. Those have already been covered by prior licensing decisions of the agency. So what makes this an enforcement action? What makes it an enforcement action is their own request that the agency issue an order to suspend or modify or revoke a license. And I should be clear too that 10 CFR 2206 also speaks about or other action that may be appropriate. So it's not necessarily confined to the terms of the license, but it's is there another case pending in this court that was argued in June that's related to all this and how is it related? Okay. Yes, there is. That case was argued in June by the department of justice. That case had come up through the district court and that case, the district court dismissed the case because it was primarily a challenge to a license amendment that had been issued at the back in 2015 at the time that Southern California announced that it was going to cease operations and needed to modify or requested modifications of its license in order to effectuate that. The district court ruled that in sum and substance, this was primarily a challenge to a license to that particular 2015 license amendment, but that under the Hobbs Act, which is the way that NRC licensing decisions are to be reviewed, that license amendment needed to be appealed through the Hobbs Act and therefore needed to be, the challenge needed to be raised in the court of appeals within 60 days of its issuance. And here we were. For the most part, that's true, your honor. I should note that there are allocations. We need to wait for the other case. That's what I want to know because our internal rules provide that the first argued case has priority. I understand that. I just want to make clear, for the most part, they're independent in the sense that this is a 2206 and a review of a 2206 petition. And the other case is a challenge to a license amendment. But there were allegations made before the district court that the NRC had abdicated its authority. And those arguments were presented to the Ninth Circuit back in June when the case was argued there. So there's some degree of overlap. And I should further note that the large amount of material that's contained within the 2206 petition that was submitted to the agency and that appears in the first 20 or so pages of Public Watchdogs' brief are the same safety-related allegations that Public Watchdogs had raised before the district court. To return to the abdication question, the record here demonstrates that there's no basis for anything close to a finding that the agency has defaulted on its fundamental mission to protect public health and safety. And that's the standard we're applying here. The agency has evaluated the safety of spent fuel storage, has determined that spent fuel can be safely stored over the long term, and it has taken and continues to take steps to make sure that fuel is stored safely at songs. This is not an abdication. It's an active engagement with a serious question. And I'll begin, well, I'd actually like to move forward a little bit and focus on the generic environmental impact statement itself, because that's the primary way in which the agency has, in fact, not done nothing, as we heard from Public Watchdogs, but in fact, thoroughly and comprehensively assessed the potential impacts of storing spent fuel on site. And as the court noted, this particular rule was the subject of notice and comment rulemaking. It was upheld by the D.C. Circuit. And in fact, it was upheld by the D.C. Circuit as part of a number of environmental organizations and also was a case in which the California Energy Commission actually submitted a brief suggesting that the analysis was not sufficiently site specific to capture the threats faced by plants in California. And the court rejected those arguments. And as it rejected those arguments, it found that, in fact, the agency had properly evaluated the impacts of spent fuel storage. And it found it upheld the agency's determination that a dry transfer system could easily and could easily be constructed at approximately 100 year intervals. Now, while it's true that that particular type of facility hasn't been constructed yet, the reason for that is that it hasn't been required. And it is correct to say that if and when such a facility needs to be constructed, the agency has, as a matter of its expertise in the area, to which this court owes a deference, has determined that such a facility can be constructed and can be constructed and licensed in a safe manner. And the agency concluded this not only in the generic environmental impact statement itself, but also in the DTE electric decision, which we've included in the excerpt of record, our supplemental excerpts of record. And in particular, the discussion at pages 170 describes the manner in which the NRC enforces the obligations of licensees and believes that it has the capabilities to make sure that such a facility can be constructed in accordance with the safety requirements. I understand about constructing a facility. The other argument that's made is that there hasn't been any demonstration of the technological feasibility of transferring the spent fuel out of the caskets that they're in. Is that covered by the generic document? That's a separate issue, Your Honor. And what the NRC has concluded is two things. Number one, that there is not a violation of the underlying requirement to be able to remove not just the canister from the facility, but actually the individual fuel assemblies. I understand that there's this regulation and you interpreted to me just after removing the weather in many years. I thought the reason for having these dry transfer facilities was in order to transfer the fuel, not just the canisters, into a new facility, presumably on the theory that the canisters don't last forever. I'm sorry, that's entirely correct, Your Honor. When the need arises for such a facility, one we anticipate can and will be constructed in a safe manner that enables the fuel to be removed and to put into a newly licensed facility that will be there for the storage of spent fuel. So there will be an option. Not just the ability to build this facility, but on the existence of technology that allows you to It's a question of being able to transfer the fuel. Correct, Your Honor. I see that we're at the five-minute mark. I do. I would like to reserve This is all complicated stuff. Okay. Can I answer the question? The NRC has determined based on its own expertise that this technology exists and it is not in any way a moonshot, as Public Watchdog suggests, to be able to construct it. Yes, and the discussion at pages 193 to 195 in the supplemental excerpts of record describe what was postulated as an anticipated type of facility. I should note, too, that this is a facility that will only need to be constructed approximately 100 years from now. And while it is true that the current decommissioning plan postulates the removal of spent fuel by 2049, approximately, there's no reason why this particular facility shouldn't be able to last far longer than that. And while it's also true that the current license only is through 2035, there are provisions for the renewal of those dry fuel storage facility licenses for periods far longer than 20 years. We'll give your colleague five minutes. And that is, as we went through the argument with Mr. Walford, it appeared that ultimately his concern was the availability of in terms of both the application argument and the arbitration argument. What does the record demonstrate in that regard? Well, the record demonstrates that the agency has looked at the issue of funding, that it currently anticipates a $900 million surplus at the end of the day. We would certainly submit that $900 million is more than ample funding to be able to plan for the type of environment where some subsequent facility needs to be constructed. Also working in the background is the fact that there is litigation on which Southern California Edison has succeeded in the past and on which I anticipate it would succeed in the future, whereby it has obtained damages from the United States to pay for precisely these expenditures to store spent fuel. So between the $900 million already that had been banked plus the growth of that fund, as well as potential litigation recoveries, the record demonstrates that there's more than ample money in the fund and certainly that it's not arbitrary and capricious or an abdication of the agency's responsibility not to have insisted on more now based on the eventuality of something that might happen 100 years from now. Okay. Thank you very much, Mr. Reynolds. I'll give you five minutes. Thank you. Good morning and may it please the court. I'm James Evans and represent intervener Southern California Edison Company. Given my very limited time, I will touch only on a couple of points. I think before I go to my formal presentation, I'd like to address the question that Judge Berzon asked about retrievability and the demonstration of retrievability that a public watchdog complains about. There were two forms of retrievability that were demonstrated and are supported by the record. First, SDE demonstrated to the NRC its ability to retrieve Holtex multipurpose canisters from their vaults, including demonstrations to the NRC using practice canisters during dry run and pre-operational testing runs. The NRC noted that SDE was fully successful in downloading and retrieving the canister during the exercise and that can be found at the record at page 3. And likewise, in connection with Holtex licensing or the NRC's licensing of Holtex storage system, Holtex demonstrated its ability to reopen the canisters themselves and that can be found at SDE supplemental record at page 929. And the quote from that page states, all cutting demonstrations were successful and the NPC lid was removed from the shell and the cutting evolution had been successfully completed on the same model of NPC canister at one site. That also can be found at SDE supplemental record at page 1053. So the notion that neither Edison nor the NRC have complied with the regulations requiring retrievability is just flatly refuted by the record. This is an enforcement action, first and foremost. In fact, it's the fifth or one of five enforcement actions brought by public watchdogs in connection with the very same issues, the storage of spent fuel. And as the courts aware, the NRC's denial of the petition at BART is presumptively unreviewable and the NRC has touched on what the legal standard is, but basically a public watchdog must show an application of statutory responsibilities by inexcusably defaulting on its fundamental responsibility to protect the public from nuclear accidents. And I speak the obvious in saying that isn't the case here. Petitioner hasn't offered any evidence that will rebut this challenge. The record demonstrates overwhelmingly that in regulating the storage of spent fuel at Songs, the NRC more than fulfilled its important obligations. Spent nuclear fuel has been stored at Songs since 2003 under NRC oversight and in accordance with regulations. The NRC previously concluded that dry canister storage offers a safe means of storing spent nuclear fuel on site. 17 years of safe storage at Songs supports this conclusion. And Petitioner? I gather that neither you nor NRC is contending that there's any mootness problem, even though all the storage has occurred. Is that right? I'm sorry, I missed the question. They're not claiming that there's a mootness problem here or stash ripeness problem. I mean, it strikes me that there's no immediate issue about storing material because it's all been stored. And any issues with regard to what will happen in the future rise 30 years down the line, as I understand it, at the earliest. Yeah, 30, 2049, according to public watchdogs. So the remedy that's being sought here is a revision of the license, but only with regard to something that isn't happening now. Is that right? Well, clearly the remedy they're seeking is the complete discontinuance of all decommissioning activities on site. As your honor has noted, all of the spent fuel has now been successfully transferred into dry storage canisters and placed into the ISPA-C that the NRC specified for use at SOMS. So the NRC has been actively involved. The notion that the NRC has somehow abdicated its responsibility is refuted by several very prominent pieces of evidence. First, the NRC reviewed, approved of, and licensed the whole tech dry storage system used at SOMS. It's certified that the system meets safety requirements, certified that those canisters have a minimum design life of 60 years, and the NRC determined that the system meets the retrievability requirements I touched on earlier. How else did they discharge their duties? Next, the NRC reviewed and approved of SCE's irradiated fuel management plan that addresses how SCE will manage spent fuel at SOMS until title and possession can be transferred to the Department of Energy for disposal in a repository. How else did they demonstrate that they fulfilled their obligations? The NRC reviewed and approved of SCE's post-shutdown decommissioning activities report, which among other things... Yes, Your Honor. It analyzed the environmental impacts specific to SOMS in connection with the decommissioning of Units 2 and 3. SCE presented the NRC with an analysis of 17 different potential environmental impacts at SOMS, and finally, the NRC continues to regulate SOMS through the decommissioning process. It has announced and unannounced inspections and publishes its findings. The NRC has been very active, and the review and oversight process has been cumbersome, but important. Thank you, Your Honor. Thank you very much. Mr. Walford, four minutes. Thank you, Your Honor. I'll be very brief. I want to address something Mr. Albert said, is that the NRC does not approve decommissioning plans, I believe was his statement, but the NRC's own regulations at 10 CFR 50.54 require nuclear power plant licensees to, quote, submit written notification to the commission for its review and preliminary approval of the program by which the licensee intends to manage and provide funding for the management of all irradiated fuel at the reactor following permanent cessation of the operation of reactor until title to the irradiated fuel and possession of the fuel is transferred to the Secretary of Energy for its ultimate disposal in a repository. All right, so, excuse me, what relief you are seeking now? What relief? What is the relief? Certainly, Your Honor, all we're asking the court to do is set aside the NRC's decision denying the 2.206 petition, remand to the NRC to require the NRC to actually plan for the reality that spent nuclear fuel will be stored at songs indefinitely and also require the NRC in assessing the 2.206 petition to comply with its own regulations and policies that govern the long-term storage and management of spent nuclear fuel and that govern the ability to retrieve spent nuclear fuel that's stored at an unforeseeable future with regard to songs, order them to do anything. I'm sorry, Your Honor, I didn't know that. You're not asking that the NRC require songs to do anything in the foreseeable future different than what they're doing? Yes, Your Honor, what we're asking is for the NRC to require the licensee to submit a decommissioning that's based in reality and not based on the false assumption. In the meanwhile, they continue to do exactly what they're doing. At this point, Your Honor, the one thing that we are asking that the NRC not do yet is to allow Edison to destroy the spent fuel pools, which they're planning to do, because that infrastructure by Edison's own admission is absolutely necessary to the development of any technology that would Edison to repackage spent nuclear fuel in a canister if it needs to be replaced or if something goes wrong. Without that spent fuel pool there, there's absolutely no infrastructure that Edison could even possibly use, even if it developed technology, to actually transfer the fuel from one canister to another. The only way to do that is with a spent fuel pool. No, Your Honor, the brief said that that was going to be destroyed this summer. The summer is sort of over, so it hasn't been destroyed. My understanding, Your Honor, is that it has not been destroyed, and I believe the briefing of Edison suggested that the plans were to destroy it sometime in the near future, potentially in October. So, yes, we would ask the NRC to not allow that to be destroyed until a real analysis based in reality is done regarding how long spent nuclear fuel will actually be sorted. Okay, thank you very much. Thank you for your arguments. This court for this session stands adjourned.
judges: Siler, Berzon, Lee